# In re Mark Gerald PUNU, Respondent

## File A72 423 857 - Houston

*Decided August 18, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The third prong of the standard for determining whether a conviction exists with regard to deferred adjudications has been eliminated pursuant to section 101(a)(48)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(48)(A) (Supp. II 1996). *Matter of Ozkok*, 19 I&N Dec. 546 (BIA 1988), superseded.

(2) A deferred adjudication under article 42.12, § 5 of the Texas Code of Criminal Procedure is a conviction for immigration purposes.

Peter D. Willliamson, Esquire, for the respondent

Lisa Luis, Assistant District Counsel, for the Immigration and Naturalization Service

Before:    Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEIL-
           MAN, HOLMES, HURWITZ, VILLAGELIU, COLE, MATHON, GUENDELS-
           BERGER, and JONES, Board Members. Concurring Opinion: GRANT, Board
           Member, joined by FILPPU, Board Member. Concurring and Dissenting Opinion:
           ROSENBERG, Board Member.

VILLAGELIU, Board Member:

The respondent appeals from the April 17, 1997, decision of the Immigration Judge finding him deportable as charged, as an aggravated felon convicted of attempted murder, and ineligible for relief from deportation. The appeal will be dismissed.

## I. PROCEDURAL OVERVIEW

The respondent is a native and citizen of the Philippines who was admitted into the United States on or about September 9, 1992, as a non-immigrant, later adjusting his status to that of a lawful permanent resident of the United States on January 6, 1993. The record reflects that on August 26, 1993, the respondent entered a plea of nolo contendere in the 179th

District Court of Harris County, Texas, to a charge of attempted murder. On that same date the trial judge deferred adjudication of the criminal charge and placed the respondent on probation until August 25, 2001. *See* Tex. Crim. P. Code Ann. art. 42.12, § 5(a) (West 1993).

On January 10, 1997, the Immigration and Naturalization Service issued an Order to Show Cause and Notice of Hearing (Form I-221), charging the respondent with deportability under section 241(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), alleging that he had been convicted of an aggravated felony as defined under section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (1994). In finding the respondent deportable, the Immigration Judge held that his deferred adjudication constituted a conviction for an aggravated felony under the new definition of the term "conviction," which was enacted by section 322 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-628 ("IIRIRA"), and codified in section 101(a)(48)(A) of the Act, 8 U.S.C. § 1101(a)(48)(A) (Supp. II 1996).[1]

## II. ARGUMENTS

On appeal the respondent offers several constitutional challenges to the application of the newly enacted definition of the term "conviction" to his August 16, 1993, deferred adjudication, claiming violations of the Fifth Amendment's due process, full faith and credit, and ex post facto clauses. Similarly, the respondent offers a number of arguments why his deferred adjudication cannot constitute a "conviction" for immigration purposes, including the following: all direct appeals of his adjudication have not been exhausted; the statute does not specifically reference deferred adjudications; the Texas deferred adjudication statute provides for dismissal of charges upon completion of probation; and the new definition of conviction is inapplicable, as his deferred adjudication was entered prior to its enactment. The respondent also maintains that *Martinez-Montoya v. INS,* 904

---

[1] Section 101(a)(48)(A) of the Act provides as follows:

The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

225

F.2d 1018 (5th Cir. 1990), is controlling precedent in the circuit in which this case arises, and that it mandates an outcome contrary to that arrived at by the Immigration Judge in this case.

In response, the Service contends that Congress deliberately broadened the scope of the definition of a "conviction," as enunciated by this Board in *Matter of Ozkok*, 19 I&N Dec. 546 (BIA 1988), in order to obviate the effects of the various state ameliorative provisions which may follow a finding or admission of guilt and imposition of punishment.[2]  The Service asserts that Congress has abolished the requirement that an adjudication be "final" and eliminated the third prong of the *Matter of Ozkok* definition of a conviction.

## III. ANALYSIS

Initially, we reject the respondent's contention that the decision of the United States Court of Appeals for the Fifth Circuit in *Martinez-Montoya v. INS, supra*, is controlling, although this Board has historically followed a circuit court's precedent in cases arising within that circuit. *See Matter of Anselmo*, 20 I&N Dec. 25, 31 (BIA 1989), Where Congress has subsequently spoken to the precise question at issue and its intent is clear, effect must be given to congressional intent and "that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), Basic principles of statutory construction mandate that courts first "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. In determining a statute's plain meaning, we assume that "Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also INS v. Phinpathya*, 464 U.S. 183, 189 (1984), In ascertaining the plain meaning of the statute, the Board "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988), Where Congress' intent is not plain-

---

[2]In *Matter of Ozkok*, *supra*, we found that a conviction exists, for immigration purposes, where an alien has had a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where the following three-pronged test is met: (1) a judge or jury has found the alien guilty or he has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilty; (2) the judge has ordered some form of punishment, penalty, or restraint on the person's liberty to be imposed; and (3) a judgment or adjudication of guilty may be entered if the person violates the terms of his probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding his guilt or innocence of the original charge.

ly expressed or subject to an ordinary meaning, we are to determine a reasonable interpretation of the language that effectuates Congress' intent. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra.*

Similarly, the rules of statutory construction dictate that we take into account the design of the statute as a whole. *K Mart Corp. v. Cartier, Inc., supra*. In doing so, we may examine the legislative history. Although legislative statements have less force than the clear and plain language of the statute, such statements are helpful to corroborate and underscore a reasonable interpretation of the statute. *See, e.g., Weinberger v. Rossi*, 456 U.S. 25, 32 (1982).

We agree with the Service that Congress has clearly and unambiguously defined the term "conviction" for immigration purposes and thus has spoken directly to the issue before the Board. Congress has expressly stated that its intent in enacting section 322 of the IIRIRA was to "broaden[] the scope of the definition of 'conviction' beyond that adopted by the Board of Immigration App*eals in Matter of Ozkok*." H.R. Conf. Rep. No. 104-828, at 224 (1996) ("Joint Explanatory Statement"), In this regard, the conference report states:

> As the Board noted in Ozkok, there exist in the various States a myriad of provisions for ameliorating the effects of a conviction. As a result, aliens who have clearly been guilty of criminal behavior and whom Congress intended to be considered "convicted" have escaped the immigration consequences normally attendant upon a conviction. Ozkok, while making it more difficult for alien criminals to escape such consequences, does not go far enough to address situations where a judgment of guilt or imposition of sentence is suspended, conditioned upon the alien's future good behavior. . . . In some States, adjudication may be "deferred" upon a finding or confession of guilt, and a final judgment of guilt may not be imposed if the alien violates probation until there is an additional proceeding regarding the alien's guilt or innocence. In such cases the third prong of the Ozkok definition prevents the original finding or confession of guilt to be considered a "conviction" for deportation purposes. This new provision, by removing the third prong of Ozkok, clarifies Congressional intent that even in cases where adjudication is "deferred," the original finding or confession of guilt is sufficient to establish a "conviction" for purposes of the immigration laws.

*Id.*

Similarly, the purpose of the newly enacted section 101(a)(48)(A) was summarized as follows: "It broadens the definition of 'conviction' for immigration law purposes to include all aliens who have admitted to or been found to have committed crimes. This will make it easier to remove criminal aliens, regardless of specific procedures in States for deferred adjudication . . . ." H.R. Rep. No. 104-879 (1997), *available in* 1997 WL 9288 at *295. Thus, it is clear that Congress deliberately modified the definition of conviction to include deferred adjudications.

The Texas statute under which the respondent received an order of deferred adjudication provides:

227

> [W]hen in its opinion the best interest of society and the defendant will be served, the court may, after receiving a plea of guilty or plea of nolo contendere, hearing the evidence, and finding that it substantiates the defendant's guilt, defer further proceedings without entering an adjudication of guilt, and place the defendant on probation.

Tex. Crim. P. Code art. 42.12, § 5(a).

The record reflects that the respondent received a deferred adjudication for attempted murder on August 26, 1993. The respondent concedes that, in conjunction with his deferred adjudication, he was placed on probation for 8 years. The respondent's suggestion that probation is not a form of punishment or a restraint upon his liberty is incorrect. The Texas Court of Criminal Appeals has specifically held that an order of deferred adjudication itself can be regarded as a form of punishment. *Watson v. State*, 924 S.W.2d 711, 714 (Tex. Crim. App. 1996). Moreover, the Supreme Court has consistently recognized probation as a form of punishment or restraint. *See Staples v. United States*, 511 U.S. 600, 636 (1994); *United States v. Granderson*, 511 U.S. 39 (1994); *Mistretta v. United States*, 488 U.S. 361, 363 (1989); *Hicks v. Feiock*, 485 U.S. 624, 640 (1988) (stating that a fixed term of probation is itself a punishment).

In light of the undisputed facts presented, we find that the Immigration Judge properly found that the respondent was convicted of attempted murder, an aggravated felony, for immigration purposes. Section 101(a)(48)(A) of the Act. Moreover, while we recognize that the Texas deferred adjudication statute allows for the possibility of further appellate review if certain circumstances occur,[3] we find that the possibility of such review is not determinative. Congress, for purposes of deferred adjudications, has specifically excluded from the definition of "conviction" the third prong of the standard enunciated in *Matter of Ozkok, supra*, requiring that a judgment or adjudication of guilt may be entered if the alien violated probation, without further proceedings regarding guilt or innocence on the original charge. Although such further proceedings are potentially available under the Texas deferred adjudication statute, Congress has specifically explained that it intended to obviate the need to inquire into that fact.

---

[3]The relevant statute further provides:

> On violation of a condition of probation imposed under Subsection (a) of this section, the defendant may be arrested and detained . . . . The defendant is entitled to a hearing limited to the determination by the court of whether it proceeds with an adjudication of guilt on the original charge. No appeal may be taken from this determination. After an adjudication of guilt, all proceedings, including assessment of punishment, pronouncement of sentence, granting of probation, and defendant's appeal continue as if the adjudication of guilt had not been deferred.

Tex. Crim. P. Code art. 42.12, § 5(b).

Based upon our conclusion that Congress expressly modified the test delineated in *Matter of Ozkok*, we find that *Martinez-Montoya v. INS, supra*, no longer controls the issue before us. That case was premised on our reasoning in *Matter of Ozkok, supra*, which Congress has now affirmatively revised. Moreover, "[i]n the absence of a plain indication to the contrary, . . . it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law." *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 603 (1971). Congress has expressed its intent that the application of the definition of the term "conviction" to deferred adjudications not be dependent on the vagaries of State law, as the new definition is specifically intended to "make it easier to remove criminal aliens, *regardless of specific procedures in States for deferred adjudications.*" H.R. Rep. No. 104-879 (1997) (emphasis added).

The respondent's remaining arguments are similarly unavailing. The respondent correctly noted that this Board cannot entertain constitutional challenges to the statutes we administer. *See Matter of Awadh*, 15 I&N Dec. 775 (BIA 1976); *Matter of Bulos*, 15 I&N Dec. 645 (BIA 1976); *Matter of Chery and Hassan*, 15 I&N Dec. 380 (BIA 1975), Moreover, it is well established that the prohibition against ex post facto laws does not apply to deportation statutes. *Galvan v. Press*, 347 U.S. 522, 531-32 (1954); *Harisiades v. Shaughnessy*, 342 U.S. 580, 594-95 (1952); *Matter of Gomez-Giraldo*, 20 I&N Dec. 957 (BIA 1995); *Matter of C-*, 20 I&N Dec. 529 (BIA 1992), Furthermore, the Supreme Court, this Board, and the circuit in which this case arises have consistently held that Congress may constitutionally attach new immigration consequences to past criminal conduct. *Lehman v. United States ex rel. Carson*, 353 U.S. 685, 690 (1957); *Harisiades v. Shaugnessy, supra; Ignacio v. INS*, 955 F.2d 295, 298 (5th Cir. 1992); *Matter of Gomez-Giraldo, supra.*

In closing, we note that the respondent's argument that the new definition of a conviction is inapplicable to his appeal is without merit. Section 322(c) of the IIRIRA specifically states that amendments made by section 322(a) "shall apply to convictions and sentences entered before, on, or after the date of the enactment of this Act." *Matter of S-S-,* 21 I&N Dec. 900, at 902 (BIA 1997); *Matter of Yeung*, 21 I&N Dec. 610 (BIA 1997); *see also Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) (noting that when new statutory provisions attach new legal consequences to prior events, "settled expectations should not be lightly disrupted," unless, as here, Congress expressly states such an intent), The respondent's reliance on *United States v. Gomez-Rodriguez*, 96 F.3d 1262 (9th Cir. 1996), as authority in support of his argument against applying the revised definition of conviction to his case is misplaced. That case is inapplicable, as it pertains to the effective date of a different section of the Act which is not at issue here.

229

## IV. CONCLUSION

In view of the record before us, we find that the respondent is deportable as an alien convicted of an aggravated felony. The Immigration Judge correctly found that the deferred adjudication under the Texas statute is a conviction for immigration purposes. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

Board Member Lori L. Scialabba did not participate in the decision in this case.

*CONCURRING OPINION*: Edward R. Grant, Board Member, in which Lauri S. Filppu, joined

I respectfully concur.

I write separately to address the view expressed in the concurring and dissenting opinion that the "conviction" of record in this case, despite meeting the definition set forth in section 101(a)(48)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(48)(A) (Supp. II 1996), nevertheless may not be considered to support the charge of deportability under the Act because it is not "final." This argument misapprehends both the case law on which it purports to rely as well as the extent of the changes brought about by the recent addition of section 101(a)(48) to the Act. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 322, 110 Stat. 3009-546, 3009-628 ("IIRIRA").

Plainly put, section 101(a)(48) supersedes all prior case law, administrative rulings, and regulations that, in the *absence* of a clear statutory definition of a "conviction," sought to determine if an alien "convicted" under state law also should be considered "convicted" for purposes of federal immigration law. The interpretations of the term "convicted" in pre-IIRIRA case law, in Board decisions such as *Matter of Ozkok*, 19 I&N Dec. 546 (1988), and in 8 C.F.R. § 242.2 (1997) no longer have force of law independent of the new statutory definition. Moreover, analysis which looks first to pre-IIRIRA case law such as *Pino v. Landon*, 349 U.S. 901 (1955) (per curiam), pre-IIRIRA rulings such as *Ozkok*, or pre-IIRIRA regulations, and then seeks to determine what *portion* of these earlier authorities have been altered by the addition of section 101(a)(48) to the Act, is the juridical equivalent of putting new wine into old skins. Our only obligation in this case is to determine if, based on the respondent's admission of guilt and the concomitant restraint on liberty imposed, the respondent has sustained a "conviction" under the definition now set forth in the Act. This the majority capably has established, and the dissent has conceded.

230

Despite this concession, the dissent maintains that pre-IIRIRA law, chiefly *Pino v. Landon* and its progeny, remains determinative of whether a "conviction" exists for purposes of the Act. The dissent's argument rests largely on the principle that, absent manifest congressional intent to the contrary, a statutory amendment is not presumed to overturn existing judicial interpretations of the statute. *See Matter of Punu*, 22 I&N Dec. 224 (BIA 1998)(Rosenberg, concurring and dissenting), The dissent argues that under pre-IIRIRA authorities, in particular *Pino v. Landon* and its progeny, "finality" is an adjunct requirement separate from the determination of whether a "conviction" has occurred. This requirement, the dissent argues further, survives the enactment of section 101(a)(48) because Congress did not utter a clear intention to the contrary. These arguments both misread the context in which the pre-IIRIRA authorities arose and ignore the clear congressional intent to make a deferred adjudication "final" for purposes of federal immigration law.

On the first point, it is useful to note why the rules of construction engendered by *Pino* must be re-examined in light of the subsequent congressional action in section 322 of the IIRIRA to enact, for the first time, a definition of "conviction" for all purposes under the Act, including to establish deportability.

The derivation of the "finality" requirement occurred under very different circumstances. "Finality" evolved to impose upon the vagaries of state law definitions of "conviction" a uniform federal standard that would accord with the underlying policies of section 241 of the then-recently enacted Immigration and Nationality Act of 1952, ch. 477, 66 Stat. 163. *Pino v. Nicolls*, 215 F.2d 237 (1st Cir. 1954), *rev'd on other grounds, Pino v. Landon*, 349 U.S. 901 (1955) (per curiam). The United States Court of Appeals for the First Circuit noted that, as a general matter, federal courts are governed by the laws of the states in determining whether an alien has been "convicted" of a crime that will sustain deportability. *Pino v. Nicolls, supra*, at 242 (citing *United States ex rel. Freislinger v. Smith,* 41 F.2d 707 (7th Cir. 1930)). However, the court also observed that under Massachusetts law, the word "convicted" may be given different meanings in different contexts, *id.* at 243, and that Massachusetts courts "obvious[ly]" had never been called upon to resolve when a "conviction" under state law satisfied the requirements for deportability of an alien under federal law. Thus, the authority of state law could not solely be relied upon to determine as a matter of federal policy whether an alien's "social undesirability has . . . been sufficiently established for purposes of deportation." *Id.* at 244.

"In this context," the court observed, "in the interest of a uniform application of the federal statute, the meaning of the word 'convicted' is a federal question to be determined upon due consideration of the policy which § 241(a)(4) of the . . . Act was designed to serve." *Id.* at 243. On this point, the court believed, federal policy would best be served by a rule of con-

struction that ensured the certainty and reliability of the underlying state conviction being relied upon to establish deportability in the first instance.

> [S]ince legal determination of guilt is made the statutory test of deportability, we should seek an interpretation of the word "convicted" in § 241(a)(4) as will ensure that this legal determination has been made with reasonable certainty and finality.

*Id.* at 244. In "seeking" this definition, the court noted that a formal plea of guilty is "[p]erhaps" a conviction, "even before the court takes any action on the matter of sentence." *Id.* In the case before it, however, respondent Pino pled "not guilty," was tried, and was found guilty. *Id.* at 241, 244. The Government contended that this adjudication of guilt, without more, satisfied the statutory requirement of being "convicted." *Id.* at 244. The First Circuit disagreed, noting that judicial resolution of a motion for new trial or disposition of "normal routine appellate review" are part of the "ordinary processes of re-examination, the outcome of which *perhaps ought to be awaited* before it can be said, with sufficient certainty and definiteness, that the state has 'convicted' the alien of crime." *Id.* (emphasis added).

It is clear from *Pino* and its progeny, therefore, that "finality" is not a separate requirement in the determination of whether an alien has been "convicted" for purposes of federal immigration law. Rather, it was an integral element of that determination. *See Martinez-Montoya v. INS,* 904 F.2d 1018, 1022 (9th Cir. 1990) (noting a "singular lack of evidence of legislative intent to show that Congress has acted to establish a federal standard to determine whether or not a state criminal conviction has occurred"); *Will v. INS*, 447 F.2d 529, 531 (7th Cir. 1971) (noting absence of "anything of significance in the legislative history of the Act casting light on the precise concept Congress sought to embody by the use of the term 'convicted'"). As stated by the Second Circuit in *Marino v. INS*, 537 F.2d 686, 691 (2d Cir. 1976), "[A]n alien is not deemed to have been 'convicted' of a crime under the Act until his conviction has attained a substantial degree of finality." The First Circuit has agreed, noting that the requirement of finality is "[s]uperimposed on [*Ozkok*'s] three-part test" of what constitutes a conviction under the Act, a requirement that is satisfied "if direct appellate review of the conviction has either been exhausted or waived." *White v. INS*, 17 F.3d 475, 479 (1st Cir. 1994) (citing the footnote in *Matter of Ozkok, supra*, at 552), Finally, the Fifth Circuit, addressing the issue of whether a Texas "deferred adjudication" constitutes a conviction, stated that "even if the deferred adjudication of his guilty plea was considered a conviction," the respondent could not "be considered *convicted for immigration purposes* because the *alleged* conviction [was] not final." *Martinez-Montoya v. INS, supra*, at 1025 (citing *Pino v. Landon, supra*) (emphasis added),

The enactment of section 101(a)(48) of the Act eradicates the key jurisprudential underpinnings of *Pino* and its progeny. First, rather than a

"singular lack of . . . legislative intent" on the issue, *Martinez-Montoya v. INS, supra*, at 1022, Congress now has clearly spoken on the "precise concept [it] sought to embody by the use of the term 'convicted'" in the Act, *Will v. INS, supra*, at 531. Second, the Board and the courts are no longer engaged in "seeking [a] definition" of conviction that will provide a "uniform application" that carries forth the policies designed to serve by the Act. *Pino v. Nicholls, supra*, at 244. Section 101(a)(48) now sets forth both the policy and the ground rules for uniform application. Third, the Board and the courts no longer need speculate on matters such as whether a formal plea of guilty "perhaps" constitutes a conviction under the Act—the plain language makes it so, provided a concomitant restraint on liberty is imposed. Sections 101(a)(48)(A)(i), (ii). Fourth, the Board and the courts no longer are to rely on the vagaries of ameliorative provisions in state law in order to determine whether a "conviction" exists for purposes of the Act. H.R. Conf. Rep. No. 104-828, at 224 (1996) ("Joint Explanatory Statement").

The pre-IIRIRA "finality" requirement, therefore, must be seen for what it is: a rule of construction, adopted in the absence of clear congressional intent, to provide a uniform federal rule to a question that might otherwise depend on the vagaries of state law. To the extent that any such rule of construction survives the enactment of section 101(a)(48) of the Act, it cannot be applied to derogate the plain legislative intent of Congress. *See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984) (stating that if Congress has spoken to the precise question at issue and its intent is clear, both the court and the agency must give effect to congressional intent and "that is the end of the matter"). In the case at hand, imposition of an adjunct requirement of "finality" based on the contingent availability of appeal to an alien who clearly has sustained a "conviction" within the meaning of section 101(a)(48) would do precisely that—vitiate the clear and unambiguous intent of Congress to treat as "convicted" for purposes of federal immigration law an alien who has been granted a deferred adjudication.

The dissent proposes to divide the issue of whether an alien has been "convicted" for purposes of federal immigration law into two discrete inquiries: first, whether there has been an adjudication or admission of guilt sufficient to constitute a "conviction," and second, whether that conviction is "final." The dissent *concedes* that the deferred adjudication in this case is a "conviction" under section 101(a)(48), but then *denies* that it can constitute a basis for deportation because it has not reached a sufficient degree of "finality." The result is irrational: a deferred adjudication that fully meets the Act's definition of a "conviction" is held, due to the extraneous requirement of "finality," not to constitute a "conviction" sufficient to sustain a charge of deportability.

Section 101(a)(48) invalidates such a bifurcated analysis. The single

233

inquiry is, as it has been since *Pino*, whether or not a conviction exists for purposes of federal immigration law. Under *Pino* and its progeny, the courts, in the absence of congressional intent to the contrary, imposed the element of "finality" onto that inquiry. Now, the elements of that inquiry are spelled out by section 101(a)(48), and this Board is not free to add or detract from those elements, and in particular to add an element that would in effect vitiate the definition established by Congress.

On the precise question before us, Congress manifestly intended to vacate the judicial, administrative, and regulatory rules holding a Texas deferred adjudication not to constitute a "conviction" for purposes of the Act. Henceforth, such a "deferred adjudication" constitutes a "conviction," notwithstanding the fact that the alien retains a contingent right to withdraw his or her confession of guilt, demand a formal adjudication, *and* appeal from the result of that adjudication, "This new provision . . . clarifies Congressional intent that even in cases where adjudication is 'deferred,' *the original finding or confession of guilt is sufficient to establish a 'conviction' for purposes of the immigration laws.*" H.R. Conf. Rep. 104-828, at 224 (1996) (emphasis added). The confession of guilt and imposition of penalty in this case, therefore, must be found sufficient to establish a "conviction" under the Act. Congress presumptively was aware that deferral of formal adjudication perforce results in deferral of any right of appeal from that adjudication (should it ever take place). A conviction established for purposes of the Act notwithstanding the deferral of formal adjudication cannot be vitiated due to the concomitant deferral of the right of appeal from that deferred adjudication.

This case does not require us to resolve all questions that may arise in determining whether the definitional elements of section 101(a)(48) are met in a particular case.[1] It suffices for us to determine that, here, the elements of section 101(a)(48) have been established.

For these reasons, and those set forth by the majority, I concur in the dismissal of respondent's appeal.

*CONCURRING and DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully concur in part and dissent in part.

The issue in this case is whether the respondent—who pled nolo contendere to the charge of attempted murder under article 42.12, section 5(a) of the Texas Criminal Procedure Code and is subject to a period of community supervision continuing until August 25, 2001—is deportable under

---

[1]For example, this opinion does not address the circumstance of an alien against whom a formal adjudication of guilt has been entered by a court, but who has pending a noncollateral post-judgment motion or direct appeal.

section 241(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), as an alien who has been convicted of an aggravated felony. As the basis for an order of deportability, the evidence must establish that the respondent has been "convicted" of the offense that is alleged in the Order to Show Cause ("OSC"), and that his conviction is "final."[2] Such a conviction must be "final," not only in terms of our characterization of the trial procedures that were followed, but in terms of the waiver or exhaustion of available appellate procedures. Accordingly, we must determine two separate questions of fact and law—first, whether a conviction exists, and second, whether it is a final conviction in relation to the availability of direct appeal.

The definition of the term "conviction" contained in section 101(a)(48)(A) of the Act, 8 U.S.C. § 1101(a)(48)A) (Supp. II 1996), goes beyond the former federal standard, which we established in *Matter of Ozkok*, 19 I&N Dec. 546, 552 (BIA 1988), to define what constitutes a conviction, and includes a situation in which, despite a violation of probation, a "final judgment of guilt may not be imposed until there is an additional proceeding regarding the alien's guilt or innocence." *Id.* at n.7; *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No 104-208, § 322(a), 110 Stat. 3009-546, 3009-628 ("IIRIRA");[3] H.R. Conf. Rep. No. 104-828, at 224 ("Joint Explanatory Statement") (articulating "prong three" or the "third prong" of the rule in *Matter of Ozkok, supra*, which was expressly overruled by section 322 of the IIRIRA). Therefore, I concur with the majority that, although the trial judge deferred the adjudication of guilt under the Texas statute, the respondent has been convicted according to the plain language of the Act.

However, I dissent from the majority's reasoning and their conclusion that the respondent is deportable, because a conviction is not "final" for purposes of incurring deportability under section 241(a)(2)(A)(iii) of the Act unless *direct appeal is waived or exhausted*. This rule, applicable to all state and federal convictions, originated with the 1955 decision of the Supreme

---

[2]The Immigration and Naturalization Service bears the burden of proving by evidence that is clear, unequivocal, and convincing that the respondent has a final conviction for an offense classifiable as an aggravated felony. *See Woodby v. INS*, 385 U.S. 276 (1966) (articulating and assigning the burden of proof in deportation proceedings); 8 C.F.R. § 240.46(a) (1997) (stating that a determination of deportability is not valid unless it is found by clear, unequivocal, and convincing evidence that the facts alleged and charged are true).

[3]As this is a deportation proceeding that was initiated prior to April 1, 1997, it is governed in most respects by the Immigration and Nationality Act, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"). *See* IIRIRA § 309(c)(1), 110 Stat. at 3009-625. Nevertheless, unless otherwise precluded, the definition introduced in the IIRIRA, effective September 30,1996, is applicable. *See* IIRIRA § 322(c); *Matter of S-S-,* 21 I&N Dec. 900, at 902 (BIA 1997).

Court in *Pino v. Landon*, 349 U.S. 901 (1955) (holding that the disposition in question lacked a sufficient degree of finality to constitute a final conviction that would support a finding of deportability), and is universally accepted by administrative and judicial authorities as constituting a federal standard in its own right. *See Matter of Ozkok, supra*, at 552, n.7, and cases cited therein; *see also Evitts v. Lucey*, 469 U.S. 387 (1985).

This well-established requirement was not rejected or modified by Congress either in the plain statutory language of section 101(a)(48)(A) of the Act or in the legislative history relating to it. *See* Joint Explanatory Statement, *supra*, at 223-24; *cf. Matter of Fuentes-Campos*, 21 I&N Dec. 905 (BIA 1997) (relating to the well-established interpretation of the phrase "is deportable"). Although the majority glosses over the essential question of whether the respondent's conviction is a final one in relation to the availability of direct appeal, the answer is dispositive of the appeal before us.[4]

As the statute under which the respondent entered a plea of nolo contendere provides that he retains the right of direct appeal throughout the period that he must comply with the disposition entered under article 42.12, section 5(a) of the Texas statute, the respondent's right of direct appeal remains in effect. *See* Tex. Crim. P. Code Ann. art. 42.12, § 5(b)(West 1993); *see also Martinez-Montoya v. INS*, 904 F.2d 1018, 1025 (5th Cir. 1990) (concluding that an adjudication that is subject to direct appeal under article 42.12, section 5 is not a "final" conviction). Therefore, despite the fact that the respondent has been "convicted," as now defined under section 101(a)(48)(A) of the Act, his conviction is not *final. Wilson v. INS*, 43 F.3d 211 (5th Cir.), *cert. denied*, 516 U.S. 811 (1995) (citing *Pino v. Landon, supra*, and *Martinez-Montoya v. INS, supra*, as authority for finding that the requirement of finality of conviction was satisfied when the respondent's period of appeal from a jury verdict had expired).

In the absence of a final conviction of the offense charged as the underlying basis for deportability, the record before us does not contain clear, unequivocal, and convincing evidence that the respondent is deportable as charged. His appeal should be sustained, not dismissed, and the charges against him should be terminated.

## I. ESSENTIAL UNDERPINNINGS: THE INDEPENDENT FEDERAL STANDARD REQUIRING FINALITY OF CONVICTION RELATED TO DIRECT APPEAL

The federal standard requiring that direct appeal of a conviction must

---

[4]The concurring opinion insists, remarkably, that the respondent's right of direct appeal of his state adjudication has no bearing at all on our resolution of his appeal.

be waived or exhausted before it can be said that a final conviction exists for deportation purposes has been adopted uniformly by the federal courts and the Board as the rule in immigration cases for nearly half a century. *Wilson v. INS, supra*, at 215 (citing *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103 (1983), for the "general proposition that federal law governs the application of Congressional statutes in the absence of a plain language to the contrary"); *Yazdchi v. INS*, 878 F.2d 166, 167 (5th Cir.), *cert. denied*, 493 U.S. 978 (1989); *cf. Matter of L-G-*, 21 I&N Dec. 89 (BIA 1995) (regarding the federal standard for determining misdemeanor or felony level of state offense); *Matter of Manrique*, 21 I&N Dec. 58 (BIA 1995) (regarding the federal standard for finding rehabilitative first offender statutes under state law).

It must be understood that the federal standard for what constitutes a conviction in relation to a deferred adjudication procedure is distinct from what renders any conviction final with regard to availability of direct appeal. The right of direct appeal has been recognized by the Supreme Court and is not an idiosyncratic feature of only certain state statutory schemes, but is common to many. *Evitts v. Lucey, supra*, at 396 (stating that "[i]n bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, with its consequent drastic loss of liberty, is unlawful"); *see also Goodwin v. Johnson*, 132 F.3d 162, 174 (5th Cir. 1997) (indicating that "[t]he appellate process exists solely for the purpose of correcting errors that occurred at the trial court level"), Unless waived, a right of direct appeal attaches to most convictions during whatever period is provided by an individual statute, and in some cases, the right may apply to judgments reached based on a defendant's guilty plea. *See Evitts v. Lucey, supra* (stating that no disposition constitutes a final conviction unless and until direct appeal has been waived or exhausted); *see also Taylor v. United States,* 495 U.S. 575, 578 (1990) (addressing federal standard for definition of burglary in the context of the defendant's appeal following his guilty plea); *United States v. Addonizio*, 442 U.S. 178, 184, (1979) (distinguishing direct appellate review from collateral review and favoring direct review to preserve the concept of finality).

### A. Pino, Not Punu, Embodies The Supreme Court's Requirement ofFinality Related To Direct Appeal

In *Pino v. Landon, supra*, at 901, the Supreme Court declined to find that the conviction in question "attained such finality as to support an order of deportation." Although the reasoning underlying the per curiam decision of the Supreme Court is not elaborated, the decision is not devoid of context. The Court's finding that the conviction lacked sufficient finality to support a deportation order is informed significantly by consideration of the decision rendered by the United States Court of Appeals for the First Circuit

in *Pino v. Nicolls,* 215 F.2d 237 (1st Cir. 1954), *rev'd, Pino v. Landon, supra*, from which Pino sought and was granted certiorari before the Supreme Court.

Although the First Circuit ruled against Pino, who had been convicted of both larceny and indecent liberties with a minor,[5] the court recognized that "in the interest of a uniform application of the federal statute, the meaning of the word 'convicted' is a federal question," and conceded that direct appeal was available should Pino's "on-file" conviction be taken from the files, stating that

> *we should seek an interpretation of the word "convicted" in § 241(a)(4) as will ensure that this legal determination has been made with reasonable certainty and finality. . . . [as] normal routine appellate review provided by law . . . [is] part of the ordinary processes of re-examination, the outcome of which perhaps ought to be awaited before it can be said, with sufficient certainty and definiteness, that the state has "convicted" the alien of crime.*

*Id.* at 244 (emphasis added). Nevertheless, the First Circuit specifically opined that "[t]he object, of course, is to get rid of aliens with socially undesirable criminal traits," although "[o]nce in a while, an innocent man may be convicted." *Id.* at 243. Considering whether the government "has to wait forever" for such an eventuality to occur, *id.* at 244, the First Circuit concluded that because "there [was] every probability that, once a case [was] placed on file, it [would] remain in that status undisturbed and probably forgotten," Pino had been "convicted" within the meaning of the Act, notwithstanding Pino's right of appeal. *Id.* at 245.

*This* was the decision that the Supreme Court reversed. Therefore, the Supreme Court found that where a defendant retained the right of appeal—even when almost 5 years had passed since the time the case was placed "on file"—the conviction lacked sufficient finality to support a finding of deportability.

## B. Well-Established Distinctions Between the Terms "Conviction" and "Final Conviction"

The Board's 1988 decision in *Matter of Ozkok, supra*, at 549, underscored the importance of establishing a uniform federal standard to determine what constitutes a final conviction at the state trial level. The need for such a federal standard was acknowledged decades ago in our decision in

---

[5]Notably, Pino brought his challenge to the deportation order in habeas corpus proceedings. *See Heikkila v. Barber*, 345 U.S. 229 (1953).

*Matter of O-*, 7 I&N Dec. 539, 541 (BIA 1957), and in the Attorney General's rejection of a standard that relied on the "vagaries of state law" in *Matter of A-F-*, 8 I&N Dec. 429, 446 (BIA, A.G. 1959), each of which had been issued not long after *Pino v. Landon, supra.*

Therefore, in *Matter of Ozkok*, while recognizing that the right of direct appeal constituted a separate indicator of finality, we imposed a new generic federal standard more encompassing than that contained in *Matter of L-R-,* 8 I&N Dec. 269 (BIA 1959), which had looked only to the fact that a state relied on a disposition for some state purpose to find that a conviction existed. In an effort to avoid the "vagaries of state law," we held that a conviction existed if a deferred adjudication under state law foreclosed further proceedings on the original question of the defendant's guilt or innocence in the event the conditions of the disposition were violated. *Matter of Ozkok, supra.*

## 1. Fifth Circuit Decisions and Longstanding Judicial Interpretation

Contrary to the majority's erroneous over-generalization that the decision of the United States Court of Appeals for the Fifth Circuit in *Martinez-Montoya v. INS*, *supra*, no longer controls the outcome of this appeal, the Fifth Circuit has been explicit and unequivocal concerning the separate finality element of a conviction that relates to direct appeal. Specifically, the Fifth Circuit rejected the proposition advanced by the Service's Legalization Appeals Unit ("LAU"), stating:

> Additionally, and *as a separate requirement*, the conviction must be sufficiently final to consider the alien convicted for immigration purposes. *This test "has been the standard we have applied since then [1959]* to determine whether a conviction exists for immigration purposes." *Matter of Ozkok, supra. . . .*
>
> . . . .
>
>   . . . *[A]lthough the Ozkok decision drastically changed the standard for determining whether a conviction exists at all, it nonetheless reaffirmed the continued applicability of the separate and well-established rule that an alien's conviction also must be final* to be considered a conviction for immigration purposes.

*Id.* at 1021-22 (emphasis added), The Fifth Circuit concluded that "even if the deferred adjudication of his guilty plea was considered a conviction, Martinez-Montoya still properly cannot be considered convicted . . . because the alleged conviction is not final." *Id.* at 1025.

In *Martinez-Montoya v. INS*, the court traced the requirement of finality back to *Pino v. Landon, supra*, and recognized that the requirement of finality of conviction, which is independent of factors that may determine whether a deferred adjudication constitutes a conviction, specifically man-

dates that direct appeal must be exhausted or waived. *Id*. at 1025 (citing *Matter of Ozkok, supra)*, Moreover, the Fifth Circuit has viewed the question of finality of conviction in relation to whether direct appeal has been waived or exhausted as extending beyond dispositions referred to as "deferred adjudications," and encompassing all convictions that may be relied upon for deportation purposes. For example, in *Wilson v. INS, supra*, the Fifth Circuit held that the defendant, who was found and adjudged guilty and sentenced to probation, had a final conviction when he did not appeal during the prescribed appeal period. *Id.* at 217.

The views expressed in the decisions of the Fifth Circuit discussed above are consistent with judicial authority pertaining to finality of conviction that dates back over 40 years. In *Will v. INS*, 447 F.2d 529, 531 (7th Cir. 1971), the Seventh Circuit agreed that Congress intended the term "convicted" to be given meaning in light of federal law and policies, recognizing that "it appears clear from the Supreme Court's decision in *Pino* and from past administrative interpretation that the Section contemplates a conviction which has attained a substantial degree of finality." (Citations omitted.) Relying on Pino, the court concluded "that a final curtain must have been drawn in the criminal proceedings." *Id.* at 532. Thus, the court held that, while the likelihood of Will prevailing in his direct appeal may have been questionable, "*as long as a direct appeal is pending, it is sufficient to negate finality of conviction* for the purposes of 8 U.S.C. § 1251(a)(11)." *Id.* at 533 (emphasis added); *see also In re Ming*, 469 F.2d 1352, 1354 (7th Cir. 1972) (addressing attorney disciplinary procedures).

In *Aguilera-Enriquez v. INS*, 516 F.2d 565, 570 & n.6 (6th Cir. 1975), *cert. denied,* 423 U.S. 1050 (1976), the Sixth Circuit ruled that "[w]ithin the federal judicial system, a person has not been 'convicted' of a crime under section 241(a)(11) until a judgment of conviction has been entered and until procedures for a direct appeal have been exhausted or waived" (citing the Federal Rules of Criminal Procedure, Rules 32 and 38, because "Rule 38 requires the stay of a sentence of imprisonment or probation . . .[and therefore] a sentence cannot be considered final until a direct appeal has been decided or waived. Until then, the 'final curtain' has not been drawn on the criminal proceeding.").

Moreover, in *Marino v. INS*, 537 F.2d 686, 691 (2d Cir. 1976), the Second Circuit held that a conviction must attain a "substantial degree of finality" that does not exist unless and until direct appellate review has been exhausted or waived. Going further than any court has to date, the Second Circuit focused on the fact that Marino's right of appeal had been impeded by a presidential amnesty and extended the finality doctrine to a foreign conviction because Marino could not appeal his conviction on account of the amnesty. *Id.* at 691.

The rule that waiver or exhaustion of direct appeal is an independent touchstone of finality has been continually endorsed and adopted in more

recent federal court decisions. In *Grageda v. United States INS,* 12 F.3d 919 (9th Cir. 1993), the Ninth Circuit stated expressly that "[a] criminal conviction may not be considered by an IJ until it is final" and that a conviction is not final until an alien has "'exhausted the direct appeals to which he is entitled.'" *Id.* at 921 (quoting *Morales-Alvarado v. INS*, 655 F.2d 172, 174 (9th Cir. 1981)); *see also Urbina-Mauricio v. INS*, 989 F.2d 1085, 1089 (9th Cir. 1993) (concluding that "[a] criminal conviction is final for the purposes of immigration review if the alien has exhausted or waived direct appellate review"), Similarly, in *White v. INS*, 17 F.3d 475 (1st Cir. 1994), the First Circuit stated that "*[s]uperimposed on the BIA's three-part test is an additional requirement*: the 'conviction' must have attained a sufficient degree of finality. This finality requirement is satisfied if direct appellate review of the conviction has either been exhausted or waived." *Id.* at 479 (emphasis added) (citations omitted).

As these decisions demonstrate, the federal standard related to the existence of a "final" conviction due to the unavailability of direct appeal extends to state dispositions that result either from guilty verdicts or from guilty or nolo contendere pleas resulting in a deferred adjudication. These decisions, which derive their authority from *Pino*, uphold the requirement of finality and the interpretation that finality refers to the right of direct appeal having been exhausted or waived.

### 2. Controlling Board Precedent

The Board and the Attorney General consistently have required that a conviction must attain a sufficient degree of finality to support an order of deportation. In *Matter of L-R-*, 7 I&N Dec. 318, 322 (BIA 1956; A.G. 1957), relying on *Pino v. Landon, supra*, the Attorney General reversed the Board to hold that a conviction under the Texas Suspended Sentence Act was lacking in finality and "therefore was insufficient to support an order of deportation." Similarly, in *Matter of O-, supra*, at 541, the Board recognized the need to ascertain whether a conviction had achieved the necessary degree of "finality," noting that such a determination was separate from the fact that the state may consider the disposition a conviction for some purpose. *See also Matter of Johnson*, 11 I&N Dec. 401 (BIA 1965).

When the Board took steps in 1988 to better define a federal standard under which we could assess state conviction schemes with greater uniformity, we reaffirmed the doctrine of finality of conviction with respect to the availability of direct appeal under *Pino v. Landon, supra*. Although *Matter of Ozkok, supra*, focused primarily on establishing a federal standard that would provide a more effective common denominator to assess initial adjudications made at the state trial level, we noted specifically that "[i]t is well established that a conviction does not attain a sufficient degree of finality for immigration purposes until direct appellate review of the conviction has

been exhausted or waived." *Matter of Ozkok, supra*, at 552 n.7 (citing *Marino v. INS, supra; Aguilera-Enriquez v. INS, supra; Will v. INS, supra).*

The principle that the availability of direct appeal is separate from the effect of state provisions at the trial level has been recognized unanimously by the Board, despite differences affecting the interpretation of other aspects of a "final" conviction. *See, e.g., Matter of Luviano*, 21 I&N Dec. 235, at 258 n.4 & n.5 (BIA 1996) (Hurwitz, dissenting, joined by Vacca) (citing administrative and federal decisions relating to a federal standard for determining the existence of a final conviction). This principle is upheld in a number of Board decisions that followed *Matter of Ozkok. See Matter of Chairez*, 21 I&N Dec. 44 (BIA 1995) (finding lack of right to appeal rendered conviction final); *Matter of Thomas*, 21 I&N Dec. 20, at 21 n.1 (BIA 1995) (reiterating that "a conviction does not attain a sufficient degree of finality for immigration purposes until direct appellate review . . . has been exhausted or waived" and finding that "*a non-final conviction cannot support a charge of deportability, and likewise does not trigger a statutory bar to relief, under a section of the Act premised on the existence of a 'conviction'*" (emphasis added)); *Matter of Polanco*, 20 I&N Dec. 894, 896 (BIA 1994) (acknowledging direct appeal as precluding finality, but holding that unless accepted for review, "the potential for discretionary review on direct appeal" nunc pro tunc, does not preclude a determination of finality); *Matter of Adetiba*, 20 I&N Dec. 506, 508 (BIA 1992) (finding finality of conviction based on evidence that the respondent's appeal was denied).

As these decisions demonstrate, the "sufficient finality" requirement of *Pino*, which forms the basis for the rule that a conviction is not final for deportation purposes unless direct appeal is waived or exhausted, has long been understood and accepted by the Board as a separate test, distinct from whether a state scheme affords a defendant access to further proceedings to determine guilt or innocence in the first instance. The benefit of this rule is available to a defendant who is subject to a deferred adjudication, such as the respondent, just as it is available to any defendant considered convicted as the result of a guilty plea or verdict following trial.

## II. STATUTORY CONSTRUCTION:  THE DEFINITION OF A CONVICTIONUNDER THE PLAIN LANGUAGE AND PERMISSIBLE INTERPRETATION DOCTRINES

Section 101(a)(48)(A) of the Act specifies the elements of a criminal procedure that constitute a  "conviction," codifying the definition for the first time in the history of the Act. While the statutory language makes it clear that a formal judgment of guilt, or, in the alternative, a verdict or plea followed by the imposition of some punishment or restraint on liberty, con-

stitutes a conviction, the majority's assertion that "Congress has abolished the requirement that an adjudication be 'final' *and* eliminated the third prong of the *Matter of Ozkok* definition of a conviction," *Matter of Punu*, 22 I&N Dec. 224, at 226 (BIA 1998) (emphasis added), is erroneous. It conflates the requirement of finality of conviction related to direct appeal as though it were an element of a conviction tied exclusively to our former interpretation of certain state deferred adjudications under "prong three" of *Matter of Ozkok, supra.*

Plainly, although section 101(a)(48)(A) of the Act "eliminated the third prong," it has not "abolished the requirement that an adjudication be 'final.'" As the statute is silent beyond defining what constitutes a conviction with regard to later determinations of guilt or innocence when judgment is deferred, it is inaccurate and incorrect to conclude that it addresses the status of the respondent's conviction with regard to the fact that he not only retains the right to trial, but retains the right to direct appeal. *See* Tex. Crim. P. Code Ann. art. 42.12, § 5(b). It is therefore unreasonable to conclude that "[b]ased upon our conclusion that Congress expressly modified the test delineated in *Matter of Ozkok,* we find that *Martinez-Montoya v. INS* no longer controls the issue before us." *Matter of Punu, supra*, at 229 (citation omitted). Such a conclusion violates the longstanding rule pertaining to the availability of direct appeal, acknowledged unequivocally as being controlling by the United States Court of Appeals for the Fifth Circuit in *Wilson v. INS, supra*, and *Martinez-Montoya v. INS, supra,* and constitutes an impermissible construction of the statute.

## A. Chevron Analysis of Section 101(a)(48)(A) and Applicable Principles of Statutory Construction

Our construction of the existing statutory language and the absence of any language specifically addressing either finality of conviction or direct appellate review of a conviction, is governed by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). As our purpose in interpreting the statute is to give meaning to Congress' intent in enacting it, we must identify the precise question addressed by Congress, and either give effect to the language of the statute if it is plain, or provide a permissible construction of it if it is not.

As the majority recognizes, in assessing the plain language of the statute under the *Chevron* test, we must consider it in the context of the statute as a whole. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *INS v. Phinpathya*, 464 U.S. 183, 189 (1984); *see also Matter of Fuentes-Campos*, 21 I&N Dec. 905 (BIA 1997). Therefore, principles of statutory construction should guide us in interpreting the plain language regarding "conviction," as well as in providing a reasonable interpretation of the

243

statute in the event it is ambiguous.

The precise question addressed by Congress in adding section 101(a)(48)(A) to the Act, relevant to the case before us, is the effect of a deferred adjudication in which a plea of guilty or a plea of nolo contendere is entered and/or a guilty finding is made, and punishment or some other restriction on the defendant's liberty is imposed. The language of the statute regarding what constitutes a *conviction* is plain with respect to a change in the definition of a conviction. However, the statute does not define what constitutes a *final* conviction for purposes of establishing deportability, and if "Congress has not directly addressed the precise question at issue," it is for the agency—here the Board—to construe the issue and for a reviewing court to determine whether such a construction "is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra*, at 843; *see also Hamdan v. INS*, 98 F.3d 183, 185 (5th Cir. 1996) (describing the second part of its two-prong standard of review, articulated in *Animashaun v. INS,* 990 F.2d 234, 237 (5th Cir.), *cert. denied,* 510 U.S. 995 (1993), as applying the standard that an agency interpretation must be reasonable to be upheld).

In adding section 101(a)(48)(A) of the Act, Congress did not include any language referring to direct appellate review as an element of finality of conviction. Given the fact that it made such a significant change in eliminating "prong three," it is notable that Congress did not specifically address *Pino v. Landon, supra*, which has been understood by the federal courts of appeals, as well as by the Board and by the Attorney General, to require that direct appeal must be exhausted or waived. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992).

### 1. Intent Indicated in Legislative History

The legislative history is silent regarding Congress having had any intent to eliminate either the rule of *Pino v. Landon* applicable to direct appeal, or the standard of finality of conviction requiring waiver or exhaustion of direct appellate review. Moreover, Congress did not alter the finality requirement in the AEDPA, which was enacted only 6 months before the IIRIRA focused specifically on terrorists and criminal aliens, and it did not address finality related to direct appeal in any legislative history associated with the AEDPA. As the Supreme Court stated in *INS v. Cardoza-Fonseca, supra*, when "the plain language of this statute appears to settle the question before us . . . we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses. In this case, far from causing us to question the conclusion that flows from the statutory language, the legislative history adds compelling support to our holding . . . ."

*Id.* at 433 (citations omitted).

Although silent as to the effect of direct appeal, the legislative history is clear. Congress' elimination of "prong three" of the *Ozkok* decision in favor of a new federal standard was intended to overcome the "myriad of provisions" that allowed "aliens *who have clearly been guilty of criminal behavior* . . . to . . . escape the immigration consequences." Joint Explanatory Statement, *supra*, at 224 (emphasis added), The requirement that a conviction must be final, in terms of direct appeal, does not conflict with the intent of Congress as elaborated in the legislative history accompanying section 101(a)(48)(A) of the Act, and actually can be said to further it. In *Evitts v. Lucey, supra*, at 399-400, the Supreme Court found that a system of appeal as of right, although not mandated by the constitution, "is established precisely to assure that *only those who are validly convicted have their freedom drastically curtailed.*" (Emphasis added). Thus, the requirement of finality of conviction related to direct appeal ensures that only those respondents whose convictions are legitimate indications of their guilt of a deportable criminal offense are subject to deportation consequences.

Furthermore, despite expressly intending to avoid the "myriad of provisions" in different state statutes, the legislative history does not—and cannot, as a practical matter—foreclose reference to state criminal procedures for purposes of determining the applicability of the new federal standard. In other words, the most encompassing federal standard for what constitutes a conviction is still dependent upon the elements of the state statute. *See, e.g., Cabral v. INS*, 15 F.3d 193, 196 n.5 (1st Cir. 1994) (stating that we look to state law only to determine the elements of the offense of conviction (citing *Matter of H-*, 7 I&N Dec. 359, 360 (BIA 1956))).

For example, under section 101(a)(48)(A) of the Act, if a formal judgment of guilt does not exist, the state disposition in question must, *as a matter of fact*, include a finding of guilt or a plea of guilty, nolo contendere, or admission to sufficient facts to warrant a finding of guilt. Similarly, the court must, *as a matter of fact*, impose some form of punishment or restraint on liberty. Clearly, it is conceivable that a state statute could exist under which no formal judgment or finding, plea, or admission of guilt is made, but in which prosecution is deferred subject to a defendant's satisfactory completion of some supervised program. Although more difficult to imagine, it also is possible that a finding or admission might be made without the imposition of any restraint on the defendant's liberty.

Likewise, when we determine whether an offense, as defined by a state statute, constitutes a ground of deportability under a particular provision of the Act, we are not relying on the state's definition of the type of crime covered as a matter of state law, but are relying on the elements of the offense, *as a matter of fact*, to determine whether the Act is violated by a conviction of the crime as defined. *See, e.g., Matter of Teixiera*, 21 I&N Dec. 316 (BIA

1996); *see also Matter of L-G-, supra; United States v. Taylor, supra.* We are not, in such cases, accepting or applying the state's construction of what constitutes a conviction, an aggravated felony, or a firearms offense, *as a matter of law*, but relying on the facts—or elements of the state statute—to determine whether the offense fits within the federal definition of a violation that incurs immigration consequences. In the same way, in applying the federal standard that the right of direct appeal must be waived or exhausted, we must rely on the provisions of state law—not to determine the standard we apply for our legal conclusion, but to determine whether a conviction is final according to that standard.

### 2. Intent Found in Acquiescence to Controlling Interpretations

As the plain statutory language that has been enacted does not compel a different reading, it is proper to infer that Congress did not change the requirement that a conviction must be final in relation to direct appeal having been exhausted or waived to support an order of deportability. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (stating that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . .." (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975); *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 366 (1951); *National Lead Co. v. United States*, 252 U.S. 140, 147 (1920); 2A C. Sands, *Sutherland Statutory Construction* § 49.09 and cases cited (4th ed. 1973))).

In *Lorillard v. Pons, supra*, at 581, the Supreme Court recognized that "*where, as here, Congress adopts a new law incorporating sections of a prior law*, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."  (Emphasis added). Congress not only is deemed to be aware of prior interpretations of a statute, but of preexisting case law, when it acts. *Scheidemann v. INS*, 83 F.3d 1517, 1526 (3d Cir. 1996). In *Lorillard v. Pons, supra, the Court stated that such a presumption was proper when*

> Congress exhibited *both a detailed knowledge of the FLSA provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation . . . . This selectivity . . . strongly suggests that but for those changes Congress expressly made, it intended to incorporate fully the remedies and procedures of the FLSA.*

*Id.* at 581-82 (emphasis added).

In enacting a statutory definition of a "conviction," Congress demonstrated a detailed knowledge of the judicial and administrative interpretation of both a conviction and a final conviction with regard to direct appeal. As in *Lorillard*, Congress was selective in eliminating one particular ele-

ment of our prior definition of a conviction that did "not go far enough . . . to establish a 'conviction' for purposes of the immigration laws." Joint Explanatory Statement, *supra*, at 224. By contrast, Congress did not abolish the requirement that an adjudication constituting a conviction must be final. Such a requirement is imposed pursuant to *Pino v. Landon, supra*, and its progeny, including Board decisions that are not controlled by "prong three" of *Matter of Ozkok, supra.*

Congress' detailed knowledge of the law and its selectivity suggests that "but for those changes Congress expressly made," it intended to maintain the existing interpretations. *Lorillard v. Pons, supra*, at 582; *see also Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 127 (1985) (stating that "*[a]nother indication that Congress did not intend to forbid [certain waivers and modifications] is its silence on the issue"*), In *Chemical Manufacturers Ass'n. v. Natural Resources Defense Council, Inc., supra,* at 127-28, the Court noted that, if the Conference Committee meant to "boldly . . . eliminate FDF variances," as the NRDC claimed, "it is odd that the Committee did not communicate it," since it was well aware of judicial decisions that ruled to the contrary. Similarly, as Congress specifically examined and expressly overruled those Board precedents with which it disagreed,[6] and failed to mention either the specific aspect of *Matter of Ozkok*, *supra*, pertaining to direct appeal, or any other Board decisions such as *Matter of Polanco, supra, Matter of Chairez, supra*, or *Matter of Thomas, supra*, which address finality of conviction in relation to the availability of direct appeal, I do not see how we can simply overlook or ignore Congress' silence.

Sound principles of statutory construction also provide that Congress will not be deemed to overrule controlling federal case law sub silentio, or by implication. *See, e.g., Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 337-38 (1988) (recognizing that Congress' failure to disturb a consistent judicial interpretation of the statute may provide some indication that Congress "'at least acquiesces in, and apparently affirms'" the interpretation (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 703 (1979))). When Congress intended to overrule the holding of the Supreme Court in *INS v. Phinpathya, supra*, which had read the statutory requirement of a period of continuous physical presence literally, without regard to

---

[6]The Joint Explanatory Statement, *supra,* expressly indicates the particular administrative decisions and the specific aspects of those decisions that it found objectionable and wished to overturn. *See, e.g., Matter of Ozkok, supra; Matter of Castro*, 19 I&N Dec. 692 (BIA 1988) (relating to imposition and execution of sentence); *Matter of Esposito*, 21 I&N Dec. 1 (BIA 1995) (same).

whether a departure was "brief, casual, or innocent," it did so by an explicit statement in the legislative history. Compare former section 244(b)(2) of the Act, *added by* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 315(b), 100 Stat. 3359, 3439-40, in which Congress expressly indicated its intent to overrule the Supreme Court's 1984 decision in *INS v. Phinpathya, supra.*

Similarly, in *Vance v. Terrazas*, 444 U.S. 252 (1980), the Court addressed 8 U.S.C. § 1481(c), enacted by Congress following the Court's decision in *Mitsugi Nishikawa v. Dulles*, 356 U.S. 129, 138 (1958), and found that its prior holding had been expressly overruled. Concluding that Congress' "evident aim was to supplant the evidentiary standards prescribed by *Nishikawa*," *Vance v. Terrazas, supra,* at 264, the Court acknowledged that "[t]he House Report accompanying § 1481(c), H.R. Rep. No. 1086, 87th Cong., 1st Sess., 40 (1961), U.S. Code Cong. & Admin. News, p. 2950, [which quoted with approval from Mr. Justice Harlan's dissenting opinion in *Nishikawa,*] took direct aim at *Nishikawa's* holding." *Id.* at 265 n.8.

Congress never has expressed specifically any interest to obviate direct appeal or to overrule *Pino v. Landon*. Consequently, the "inference" that evidence of the waiver or exhaustion of direct appeal remains an essential element of deportability based on a criminal conviction, "is buttressed by an examination of the language Congress chose to describe" a conviction. *Lorillard v. Pons, supra*, at 583 ("'[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary.'" (quoting *Standard Oil v. United States,* 221 U.S. 1, 59 (1911))); *see also Gilbert v. United States*, 370 U.S. 650, 655 (1962); *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). Under these circumstances, *Pino v. Landon*, which is understood to be at the root of the finality of conviction requirement with respect to the availability of direct appeal, must be found to control the resolution of this appeal. *See Martinez-Montoya v. INS, supra.*

### 3. Intent Based on Statutory Silence Regarding Direct Appeal

The plain language before us is limited to defining what constitutes a *conviction* and does not define what constitutes a *final conviction* for purposes of establishing deportability. We may extrapolate from *Matter of Fuentes-Campos, supra*, at 907 (BIA 1997), that "the plain language of the amendment . . . [as] construed within the context of the well-established . . . distinctions [between a conviction and a final conviction]," supports the reasonable conclusion that section 101(a)(48)(A) "applies only" to the definition of what constitutes a conviction at the trial level. This reading is con-

sistent with the principle that use of one term in a particular section of the statute, without reference to another term that is commonly accepted as having a different meaning, supports interpreting the section as being limited to its express terms. *See Matter of Fuentes-Campos*, *supra*, at 906-08 (interpreting Congress' failure to use language to expressly bar an alien who "is excludable" from eligibility for a section 212(c) waiver to indicate that access to such a waiver remains available to such an individual). Such silence militates in favor of our not disturbing the well-established and longstanding interpretation of finality of conviction as being contingent on exhaustion of direct appeal.

What is more, Congress is not unable to specify, using plain language, that direct appeal has no effect on a "conviction" when it wishes to do so. *See Travers v. Shalala*, 20 F.3d 993 (9th Cir. 1994). For example, when enacting the Medicare and Medicaid Patient and Program Protection Act in 1987, Congress broadened the definition of "conviction" to encompass not only the entry of judgment, but also the participation in "a first offender, deferred adjudication, or other program where judgment of conviction has been withheld." H.R. Rep. No. 99-727, at 75 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3607, 3665. At the same time, Congress there defined the term "conviction" in 42 U.S.C. § 1320a-7(i)(1) (1994) as "a judgment of conviction [that] has been entered against [an] individual or entity by a Federal, State, or local court, *regardless of whether there is an appeal pending* or whether the judgment of conviction or other record relating to criminal conduct has been expunged."

Silence cannot result in such a drastic change in interpretation of the immigration law as would occur were the position of the majority to be accepted. *American Hospital Ass'n. v. NLRB*, 499 U.S. 606 (1991). Perhaps equally as important as the Fifth Circuit's recognition of the independent requirement that a conviction must be final to support an order of deportation is the circuit's demand for "[evidence to indicate] greater clarity of purpose when a statute would be read to upset a status quo long in place." *United States v. Quaye*, 57 F.3d 447, 450 (5th Cir. 1995). Adopting the view of the petitioner and the Solicitor General, the Fifth Circuit reversed the deportation order of the district court, holding that nothing in 18 U.S.C. § 3583 indicated that it was Congress' intent to "undermine [the] executive prerogative sub silentio" or to "deprive aliens deported at sentencing of such relief . . . which the Attorney General may grant." *Id.*

The Supreme Court looks askance on interpretations of congressional silence that would result in fundamental changes contrary to well-established principles such as the significance of the availability of direct appeal. In *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1992), the Court majority noted that "silence in this regard can be likened to the dog that did not bark. *See* A. Doyle, *Silver Blaze, in The Complete Sherlock Holmes* 335 (1927)." The Court quoted Chief Justice Rehnquist's dissent in *Harrison v. PPG*

*Industries, Inc.,* 446 U.S. 578, 602 (1980) (Rehnquist C.J., dissenting), in which he stated that "[i]n a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night." *See also American Hospital Ass'n. v. NLRB, supra,* at 613-14 (stating that "[i]f this amendment had been intended to place the important limitation on the scope of the Board's rulemaking powers that petitioner suggests, we would expect to find some expression of that intent in the legislative history. *Cf. Harrison v. PPG Industries, Inc., supra.*

### 4. Permissible Construction That Gives Meaning to the Statute

The plain language of section 101(a)(48)(A) of the Act is not devoid of meaning when read simply to define what constitutes a conviction without disturbing the concept of finality of conviction. Nor is an interpretation of the arguable ambiguity created by Congress' silence reasonably read as eliminating the requirement that direct appeal must be exhausted or waived before a conviction is sufficiently final to sustain a finding of deportability.

Not all guilty or nolo pleas mean that the respondent is guilty or mean that a guilty defendant will "escape[]" deportation. *Evitts v. Lucey, supra; Will v. INS, supra; see also Brady v. United States,* 397 U.S. 742, 755 n.14 (1970) (citing *Alford v. North Carolina*, 405 F.2d 340 (4th Cir. 1968)). First, some convictions do not incur deportability at all. Second, the presence of a conviction has meaning independent of its status as a final conviction related to determining deportability, as the existence of a conviction—even if not final—may be a factor affecting eligibility for discretionary relief from deportation on other grounds. *See Matter of Thomas, supra.*

Third, lest it be thought that a deferred adjudication is akin to a guilty plea, and that direct appeal is limited to convictions following judge or jury trials, it must be noted that some guilty pleas are appealed. For example, in *United States v. Taylor, supra*, in which the Supreme Court addressed the need for a federal standard that defined burglary for purposes of assessing convictions under state statutes, the respondent had entered into a plea agreement in which he pled guilty, but reserved his right to appeal the resulting conviction. *United States v. Taylor* was decided in the context of that appeal, which notably did not address any claimed constitutional or procedural infirmities related to the plea, but focused on whether the defendant could be considered convicted of burglary as a substantive matter, despite his plea.

Moreover, appeals from deferred adjudications at the state trial level do remain available in some instances, even where further trial proceedings on guilt or innocence are not provided. For example, in the District of Columbia Court of Appeals, a defendant who was found guilty and received

180 days' probation under a deferred scheme nevertheless retained his right to appeal that disposition. *Mozingo v. United States*, 503 A.2d 1238 (D.C. 1986) (determining that this probationary scheme resulted in a conviction subject to appeal). Thus, contrary to the suggestion of the concurring Board Member that direct appeal is of no consequence because it is linked to and dependent on the adjudication of the respondent's guilt or innocence in the first instance, the right of direct appeal is not always dependent on the presence of further proceedings.

Furthermore, just as section 101(A)(48)(A) does not supersede the rule that direct appeal must be exhausted or waived, neither does that section limit the time period in which we honor direct appeals that remain available. These periods vary from state to state, and between state and federal statutes, often depending on the section of the statute in which the offense is addressed. For example, in New York a defendant must appeal a criminal prosecution within 30 days of the decision, or the mailing of a written decision. *See* N.Y. Crim. Proc. Law § 460.10(1)(a) (McKiney 1997). And, Connecticut requires that a defendant take a direct appeal from a criminal prosecution within 2 weeks. Conn. Gen. Stat. Ann. § 54-95(b) (West 1997), A Notice of Appeal from a federal conviction must be filed within 10 days after the entry of a judgment. *See* Fed. R. App. Proc. 4(b); *see also Taylor v. United States, supra.*

In the respondent's case may become deportable as charged sometime in the future, either when he exercises and exhausts his right of appeal, or when his period of community supervision ends and his right of appeal expires. However, the fact that he may become deportable in the future does not mean that he is deportable now. *See Matter of Ramirez-Somera*, 20 I&N Dec. 564, 566 (BIA 1992) (noting that the statutory provision precluding eligibility for a section 212(c) waiver is triggered when 5 years' imprisonment has been served and the determination when to institute proceedings is within the sole discretion of the Service).

I cannot agree that the majority provides a permissible interpretation of section 101(a)(48)(A) of the Act. *See* Ronald M. Levin, *The Anatomy of Chevron: Step Two Reconsidered,* Symposium on Administrative Law, 72 Chi.-Kent L. Rev. 1253, 1263 (1997) (asserting that in light of the fact that the Court referred in other passages of *Chevron* to "reasonableness," it has been said that an interpretation that is "permissible" might be one that, under the "hard-look" doctrine applicable to review of agency decisions, would not be arbitrary and capricious). The majority, without any authority to do so, has equated two distinct concepts. *See id.* at 1263 n.41 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 57 (1983), for the proposition that the agency must generate a "reasoned analysis" and "articulate a satisfactory explanation for its action"); *id.* at 1265 n.53 (citing *Whiteliff Inc. v. Shalala,* 20 F.3d 488, 492 (D.C. Cir. 1994), which rejected the "Secretary's indiscriminate equation of [two con-

cepts]" as being "simply illogical," without any support, and therefore an unreasonable interpretation of the statute).

The majority's interpretation, which requires us to abandon the long-standing, independent rule that appeal must be waived or exhausted before a conviction becomes final, differs markedly from the situation in *Rust v. Sullivan,* 500 U.S. 173 (1991), where the Supreme Court rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question," *id.* at 186 (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, supra,* at 862), and ruled that "[w]e find that the Secretary amply justified his change of interpretation with a 'reasoned analysis,'" *id.* at 187 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co., supra*, at 42). No similar factors, such as the original intent of the statute, the agency's practical experience, or legislative history, which were present in *Rust v. Sullivan, supra*, exist here. *Cf. Rust v. Sullivan, supra*, at 186. Instead, the majority's interpretation not only lacks any comprehensive reasoning, but far exceeds the plain language of the statute.

In defining what constitutes a conviction, Congress did not differentiate between persons *found guilty* and for whom a judgment of conviction exists, and persons who *pled guilty or nolo contendere* at the trial level. A "conviction" is deemed to exist in either case. To interpret the present language as authorizing removal when direct appeal as of right still remains pending (or before it is foreclosed by statute) in a case in which the state has deferred adjudication, results in our treating two similarly situated groups of noncitizens unequally without reason. *See Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920),

As I do not believe that the majority is prepared to go so far as to claim that the statute allows removal in cases in which a respondent has an appeal pending or retains the right of direct appeal from a judgment based on a *finding* of guilt, such a reading unnecessarily places the constitutionality of the statute in question. *Cf. United States v. Witkovich*, 353 U.S. 194, 202 (1957) (rejecting an interpretation of a statute affecting the liberty interests of aliens that would raise doubts as to the statute's validity, based on the "'cardinal principle'" favoring adoption of a construction of the statute "'by which the [constitutional] question may be avoided'" (quoting *Crowell v. Benson, 285 U.S. 22, 62 (1932)))*.

The courts have recognized that "[d]rastic consequences to the alien may result from a determination that he has been 'convicted' of a crime within the meaning of the Act." *Marino v. INS, supra*, at 691 (citing *Delgadillo v. Carmichael,* 332 U.S. 388, 391 (1947); *Costello v. INS*, 376 U.S. 120, 128 (1964)), As Chief Judge Kaufman stated in *Lennon v. INS*, 527 F.2d 187, 193 (2d Cir. 1975), "It is settled doctrine that deportation statutes must be construed in favor of the alien . . . [because Congress would not] trench on his freedom beyond that which is required by the narrowest

of several possible meanings of the words used." Should there be any doubt concerning the meaning of section 101(a)(48)(A), the rule of lenity requires that any ambiguity must be construed in favor of the alien. *See Matter of N-J-B-*, 21 I&N Dec. 812 (BIA 1997) (Rosenberg, dissenting).

### B. *Pino*, Not *Punu*, Controls Whether a Conviction Is Final and Incurs Deportability

The federal standard of *Pino v. Landon* and its progeny mandates that we adhere to the doctrine of finality of conviction, which requires direct appeal must be waived or exhausted before a conviction will support an order of deportation. In the respondent's case, appeal has neither been waived nor exhausted. According to Texas law, direct appeal remains available to the respondent. Article 42.12, § 3d(b) specifically provides: "After an adjudication of guilt, all proceedings, including assessment of punishment, pronouncement of sentence, granting of probation, and defendant's appeal continue as if the adjudication of guilt had not been deferred."

In *Martinez-Montoya v. INS*, *supra*, the Fifth Circuit stated unequivocally that "the defendant retains all rights to direct appeal from the original plea proceedings in the event the state later proceeds to adjudication." *Id.* at 1026 (citing *David v. State*, 704 S.W.2d 766, 767 (Tex. Crim. App. 1985)(en banc) (rejecting the court of appeals' finding that appellant "'waived any alleged defects in the original adjudication proceedings by failing to move for an adjudication of guilt within thirty days'")). Furthermore, in *McDougal v. State*, 610 S.W.2d 509, 509-10 (Tex. Crim. App. 1981), the Court of Criminal Appeals made clear that an order deferring adjudication pursuant to article 42.12, § 3d(a) simply is not appealable until there has been an adjudication of guilt. As the concurring judge stated, "I believe the matter is not any different, for appeal purposes, from that where the defendant has appeared in court, plead guilty or nolo contendere to a felony offense, and awaits the assessment of his punishment." *Id.* at 511 (Teague, J., concurring).

Despite the majority's reference to the "possibility" of appeal in dismissing the respondent's contention that his conviction is not final, the fact that the respondent's conviction *may be* appealed should the state court take further action does not transform the character of the direct appeal available in his case from an appeal as of right to an appeal that is discretionary. Moreover, the fact that the court could take further action over an extended period of time that the respondent remains subject to community supervision has no bearing on his right of appeal. *Cf. Pino v. Nicolls, supra*, at 244-45, overruled by *Pino v. Landon, supra* (making no distinction between this type of direct appeal and an appeal that had to be taken within a time certain). Similarly, in *Marino v. INS, supra*, the court refused to find the con-

253

viction final, despite the fact that the defendant's right of appeal *never* could be exercised.

The respondent's situation, in relation to his right of direct appeal, is hardly different from that of a defendant who has been arrested and charged with a crime but awaits a judgment, which, if adverse, he can appeal. It is the same as that of a defendant who received a judgment of conviction based on a jury verdict and whose appeal period has not expired. And, it is the same as that of a defendant who pled guilty and retains the right of appeal in a plea agreement. In all cases, where appeal is provided by statute or on another legal basis, neither an arrest, a plea, a judicial finding, or a judgment of guilt that remains subject to direct appeal constitutes a final conviction unless and until direct appeal has been waived or exhausted. *Evitts v. Lucey, supra* (acknowledging that although appeal is not constitutionally required, once the right is established, it must be honored and enforced).

In determining whether the respondent is deportable, we must afford him a proceeding that comports with the notions of fundamental fairness and due process. Former section 242(b)(4) of the Act, 8 U.S.C. § 1252(b)(4)(1994), which is applicable to the respondent's case, states, in particular, that no decision on deportability shall be valid unless supported by reasonable, substantial, and probative evidence. *See also* sections 240(b), (c)(3)(A) of the Act, 8 U.S.C. §§ 1229a(b), (c)(3)(A)(Supp. II 1996). Furthermore, the regulations place the burden of proving deportability by evidence that is clear, unequivocal, and convincing on the Service. 8 C.F.R. § 240.46(a) (1998).

It is premature to find the respondent deportable based on his "conviction." The Texas statute provides a *specific, time-limited* period of appeal for a defendant whose conviction is handled under article 42.12, just as it provides a specific appeal period for a defendant whose case is heard and decided at trial by a jury, or by a judge. There has been no waiver of the appeal period that exists in the respondent's case. The respondent's period of community supervision has not concluded, and according to the terms of the Texas statute, until that time he retains the right of direct appeal. Once that period ends, his right of direct appeal under the Texas statute will have *expired.* Until then, he is not deportable. *See Matter of Ramirez-Somera, supra.*

It is our function to review the decision made by the Immigration Judge. 8 C.F.R. §§ 3.1(b)(2), 3.38(a)(1998). And it is our responsibility to do whatever is proper and necessary to resolve the appeal. 8 C.F.R. § 3.1(d)(1)(1998), When an error by an Immigration Judge wrongly sustains a charge of deportability on less than clear, unequivocal, and convincing evidence, prejudice is apparent and the proceedings should be terminated.

## III. CONCLUSION
254

Although steeped in legal history and principles of statutory construction, the reasoning underlying my position that the respondent cannot be found deportable is simple and straightforward. As a matter of law, the requirement of finality of conviction according to the longstanding and unchanged federal standard applies to all convictions, including this one. As a matter of fact, the Texas statute under which we find the respondent has been "convicted" under section 101(a)(48)(A) of the Act is explicit: a defendant maintains his right of direct appeal from such an adjudication under this dispositional scheme while he is subject to community supervision. Thus, there is no evidence that the respondent's "conviction" is *final*— and can support an order of deportability—because he retains the right to appeal his conviction during the period that he is expected to satisfy the conditions imposed on his liberty.

The majority's reading of section 101(a)(48)(A) of the Act is both impermissible and unreasonable, as it blurs the separate tests for determining what constitutes a conviction—now defined by statute—and when a conviction attains a sufficient degree of finality to form a basis for deportation, as articulated in *Pino v. Landon, supra*, and its progeny with regard to the availability of direct appeal. To interpret the statute as obviating a finality requirement, without an express statement from Congress, throws the amended statute into direct conflict with the Supreme Court and the federal courts that have spoken to this question. I do not believe that the plain language of the statute—or a reasonable interpretation of Congress' silence with regard to finality—supports either such a reading or a finding of deportability in this case.

Consequently, I dissent. The respondent's appeal should be sustained on the basis that the record lacks sufficient evidence to establish that his conviction is final or that he is deportable as charged.